# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

ETHEL ANDERSON, WANDA
MEADOWS, JACQUELINE
LUONGO, JENNIFER JOHNSON
and VIRGINIA CROWLEY,

       Plaintiffs,

v.                            **CASE NO.:**5:24-CV-00089-WFJ-PRL

CENTURION OF FLORIDA, LLC, an
out-of- state corporation registered and
doing business in Florida; and ADER
BENOIT, in his individual capacity,

       Defendants.

_____/

## DEFENDANT, CENTURION OF FLORIDA, LLC'S, AMENDED[1] MOTION FOR FINAL SUMMARY JUDGMENT

Defendant, Centurion of Florida, LLC, ("Centurion"), by and through undersigned counsel, pursuant to Fed. R. Civ. P. 56, hereby moves this Court for entry of final summary judgment in its favor, as there are no issues of material fact as to Plaintiffs' Eighth Amendment claims. In support thereof, states the following:

### STATEMENT OF BASIS FOR RELIEF

Centurion is entitled to summary judgment because Plaintiffs cannot show evidence that Centurion had an unconstitutional custom or practice of allowing sexual assault and abuse by Dr. Benoit to occur at Lowell Correctional Institution ("Lowell CI"). Plaintiffs' reliance on the unsubstantiated reports made against Dr.

---

[1] Amended only as to Exhibits O, P, Q, R, and S and the filing of the full deposition transcripts.

Benoit is insufficient to prove "widespread" and "systemic" custom of allowing sexual abuse under the Eighth Amendment pursuant to resounding Eleventh Circuit case law. (*See*, Argument Section Infra). Plaintiffs' claim also fails on causation, as the evidence confirms that Centurion had clear policies and practices to ensure proper reporting, detection, prevention, and investigation of allegations of sexual abuse at Lowell CI. For those reasons and the reasons explained more thoroughly herein, Centurion is entitled to summary judgment as a matter of law.

## BACKGROUND

1.      Plaintiffs, Ethel Anderson, Wanda Meadows, Jacqueline Luongo, Jennifer Johnson, and Virginia Crowley, initiated this action on February 23, 2024 against Centurion of Florida, LLC, and Dr. Ader Benoit. (Doc. 1).

2.      Plaintiffs amended the complaint and filed the First Amended Complaint on March 13, 2024. (Doc. 5).

3.      In the First Amended Complaint, Plaintiffs bring claims under § 1983 for Eighth Amendment deliberate indifference against Centurion for an "unlawful policy, practice, and custom of failing to protect Plaintiffs and other patients… from sexual assault" by Co-Defendant, Dr. Ader Benoit during their gynecological appointments. (*Id*. at 2)

4.      As a result of this alleged indifference, Plaintiffs seek injunctive and declaratory relief, including allowing them to see another clinician, in addition to awarding compensatory, punitive, and nominal damages. (*Id*.)

5.      Centurion disputes that Dr. Benoit committed sexual assault or that he acted inappropriately during any of the gynecologic exams at issue. Indeed, as discussed below, every single OIG investigation conducted against Dr. Benoit concluded that the allegations were unfounded or unsubstantiated. Notwithstanding the credibility of the direct claims against Dr. Benoit, Centurion can only be held liable under § 1983 if Plaintiff can show Centurion had a custom or policy that constituted deliberate indifference to a constitutional right as required under § 1983 and *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 690 (1978).

6.      On May 6, 2024, Centurion moved to dismiss the First Amended Complaint for Plaintiffs' failure to state a claim under § 1983. Specifically, Centurion argued that Plaintiffs failed to allege that Centurion has a custom or policy that constituted deliberate indifference under *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 690 (1978). (Doc. 23).

7.      This Court ultimately entered an endorsed order denying Centurion's Motion to Dismiss but noting that "[t]he Monell "practice or custom" alleged is sufficient, although perhaps not great." (Doc. 31).

8.      Consequently, the parties then engaged in extensive discovery, including Centurion's production of over 75,000 documents of Electronically Stored Information "ESI" to Plaintiffs.

9.      Plaintiffs' expansive ESI searches were conducted in the slim hope they could ascertain evidence to support their *Monell* claim against Centurion.

10.     Fatal to Plaintiffs' claims, none of the 75,000+ documents produced in discovery demonstrate that Centurion had an unconstitutional policy or practice of allowing inmates at Lowell CI to be sexually assaulted by Dr. Benoit.

11.     As such, Plaintiffs cannot set forth evidence demonstrating that Centurion violated their Eighth Amendment rights and final summary judgment in favor of Centurion is warranted.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

12.     Plaintiff, Ethel Anderson, is a 43 year old convicted state prisoner, currently housed at Lowell CI, serving a 38 year sentence for sexually assaulting her 12 year old student.[2]

13.     Plaintiff, Virginia Crowley, is a 48 year old convicted state prisoner, currently housed at Lowell CI, serving a 25 year sentence for sexually abusing and assaulting her minor daughter.[3]

14.     Plaintiff, Jacqueline Luongo, is a 55 year old convicted state prisoner, currently housed at Lowell CI, serving a life sentence for first-degree premeditated murder, solicitation to commit murder, and tampering with a witness.[4]

---

[2] https://pubapps.fdc.myflorida.com/offenderSearch/detail.aspx?Page=Detail&DCNumber=T83007&TypeSearch=AI (last accessed on August 25, 2025).

[3] https://pubapps.fdc.myflorida.com/offenderSearch/detail.aspx?Page=Detail&DCNumber=E40303&TypeSearch=AI (last accessed on August 25, 2025).

[4] https://pubapps.fdc.myflorida.com/offenderSearch/detail.aspx?Page=Detail&DCNumber=158413&TypeSearch=AI (last accessed on August 25, 2025).

21526862v1

15.    Plaintiff, Wanda Meadows, is a 52 year old former convicted state prisoner who served a five year sentence at Lowell CI for burglary, escape, resisting arrest, and grand theft.[5]

16.    Plaintiff, Jennifer Johnson, is a 62 year old former convicted state prisoner who served a five year sentence at Lowell CI for aggravated assault and possession of a controlled substance.[6]

17.    Dr. Ader Benoit is a board certified physician who provided care and treatment to inmates at Lowell CI for Centurion of Florida, LLC from 2018-2024.

18.    Centurion is an entity contracted with the Florida Department of Corrections ("FDC") to provide medical care and treatment to inmates at contractually specified locations, including Lowell CI.

19.    Pursuant to the contract with the FDC, all Centurion providers are required to follow the policies and procedures set forth by the Department and the Office of Health Services, including adherence to procedure and policies concerning the Prison Rape Elimination Act ("PREA").

20.    The Department has instituted FDC Procedure 602.053 - Prison Rape: Prevention, Detection, and Response, which outlines their zero-tolerance sexual abuse policy. (Exhibit A).

---

[5]
https://pubapps.fdc.myflorida.com/offenderSearch/detail.aspx?Page=Detail&DCNumber=R56743&TypeSearch=IR (Last accessed on August 25, 2025).
[6]
https://pubapps.fdc.myflorida.com/offenderSearch/detail.aspx?Page=Detail&DCNumber=629512&TypeSearch=IR (Last accessed on August 25, 2025).

21.    Procedure 602.053(3)(a) provides inmates with nine different ways to report instances of sexual assault. (*Id.*)

22.    The Florida Office of the Inspector General ("OIG") then conducts all investigations of alleged sexual abuse, sexual battery, staff sexual misconduct, and sexual harassment pursuant to section 944.31, F.S. and "Sexual Battery, Sexual Harassment, and Sexual Misconduct Investigations," Procedure 108.015. (*Id.* at p. 14).

23.    Under subsection 9(e) the FDC has the authority to discipline, terminate, and report to law enforcement, any contractor or staff who has been found guilty of sexual abuse. (*Id.*)

24.    All PREA investigations are strictly confidential, and no employee, volunteer, or contractor may knowingly disclose any information relating to the investigation. (*Id.* at p. 17; 602.053(12)).

25.    Pursuant to Centurion's FDC Contract, all Centurion providers are required to adhere to FDC Procedure 602.053. (Exhibit B).

26.    Additionally, under subsection (2)(d), all contractors and volunteers are trained yearly on the policies and procedures set forth in FDC Procedure 602.053. (Exhibit A at p. 9).

27.    In accordance with its FDC contract, Centurion requires annual PREA training for all its providers and contractors.

28.    Centurion also has a policy requiring a female chaperone to be present during all gynecological examinations of inmates at Lowell CI.

*Ethel Anderson*

29.    Plaintiff, Ethel Anderson, contends that Dr. Benoit acted inappropriately in her gynecological appointments in 2019 and 2020.

30.    ███████████████████████████████████████████

███████████████████████████ (Exhibit C at pp. 81:1-7; 87:3-12).

31.    Indeed, the medical record confirms that when Ms. Anderson saw Dr. Benoit on February 1, 2019 ████████████████████████████████

████████████████████████7 ████████████████ (Exhibit D).

32.    ████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████ (Exhibit E).

33.    Ms. Booe has issued a sworn declaration in this matter. Ms. Booe confirmed her presence at the appointment with Dr. Benoit and Ms. Anderson on 3/13/20. She denies that <u>any</u> inappropriate behavior occurred and confirmed that she was trained in PREA and would have reported such an incident, had it occurred. (Exhibit W).

34.    ████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████ (Exhibit C at p. 89:8-25; Exhibit F at p. 16-24).

---

7 According to the American College of Obstetricians and Gynecologists (ACOG), "a chaperone's role is to support the patient, assist the health professional, and act as a witness to protect both patient and physician from misunderstandings or misconduct."

*Jacqueline Luongo*

35.    Plaintiff Jacqueline Luongo contends that Dr. Benoit acted inappropriately during a gynecological appointment in January 2021.

36.    Like Ms. Anderson, Ms. Luongo also confirmed ███████████ ████████████████████████████████████████████ (Exhibit H at p. 41:24-42:20; 54:7-23)

37.    The medical records confirm Ms. Luongo had a medical appointment with Dr. Benoit on January 8, 2021. During that appointment, ████████ ████████████████████████████████████████ ████████████████████████ (Exhibit I).

38.    Ms. Luongo admitted ████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████ (Exhibit H at p. 64:25-65:2; 67:9-13; Exhibit F at p. 10-15).

*Virginia Crowley*

39.    Plaintiff Virginia Crowley ████████████████████ ████████████████████████████████████████ ████████████████████████████

40.    Notwithstanding the absence of records confirming these appointments, Ms. Crowley testified ████████████████████ ████████████████████████████████████████

██████████████████████████████████████████████ (Exhibit J at p. 82:9-13; 83:7-15).

41.    Ms. Crowley contends ████████████████████████████

████████████████████████████████████████████████████

███████████████ (*Id.* at p. 83:24-93:14; 94:24-95:2).

Q.    ██████████████████████████████████████

**A.**    ██████████████████████████████████

(*Id.* at p. 93:12-14).

42.    The medical record only reflects one ████████████████████

████    on July 2, 2021. That record documents that Ms. Crowley ████████████

████████████████████████████████████████████████████

██████████████████████████████████████████ (Exhibit K).

43.    There is no record of any gynecological appointments with Dr. Benoit in 2022 or 2023.

44.    Ms. Crowley admitted that █████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████ (*Id.* at p. 105:4-6; Exhibit F at p. 1-9).

*Jennifer Johnson*

45.    Plaintiff Jennifer Johnson claims she was assaulted by Dr. Benoit during an examination in 2020.

46.     However, there are <u>no</u> medical records reflecting that Ms. Johnson

had a gynecological appointment with Dr. Benoit, or any other provider, in 2020.

████████████████████████████████████████████████████

████████████████████████████████████ (Exhibit L at p. 11:16-25).

47.     Despite no actual record of a medical appointment occurring, Ms.

Johnson   contends ████████████████████████████████

████████████████████████████████████████████████████

(*Id.* at p. 56:10-25).

48.     However, Ms. Johnson also testified several times that ████████████

████████████[8]

      Q.  ████████████████████████

      **A.**  ████████████

- -

      Q.  ████████████████████████

      **A.**  ████████████

(*Id.* at pp. 83:7-8, 19-20).[9]

49.     Ms. Johnson was even asked ████████████████████████████

████████████████████████████████████████████████████

████████ (*Id.* at p. 88:8-21).

50.     Importantly, Ms. Johnson admitted ████████████████████████

████████████████████ (*Id.* at pp. 83:21-84:1). Thus, there are no grievances or

OIG investigations relating to this alleged incident.

---

[8] Dr. Benoit is a black male of Haitian decent.

[9] Three weeks after her deposition, Ms. Johnson signed an Errata sheet in which she changed
her testimony to ████████████████████

*Wanda Meadows*

51.    Plaintiff    Wanda    Meadows    testified ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

(Exhibit M at p. 43:20-44:4).

52.    The medical record documents that Ms. Meadows was seen by Dr.

Benoit ███████████████████████████████████████

███████████████████████████████ (Exhibit N).

53.    Importantly, Ms. Meadows plainly admitted that ████████████

████████████████████████████████████████████████

████████



(Exhibit M at p. 126:6-12).

54.    There are no grievances or OIG investigations relating to this alleged

incident.

*Centurion Chaperones*

*Chanel Hopkins, CNA*

55.    On August 1, 2025, Chanel Hopkins, CNA, was deposed by counsel for Plaintiffs.

56.    Ms. Hopkins began working as a Certified Nursing Assistant at Lowell CI in 2020. (Exhibit O, p. 18:4-19:9). She began working as a gynecological assistant with Dr. Benoit in 2021. (*Id.* at pp. 21:24-22:9).

57.    Aside from Dr. Benoit, she also worked with the female gynecologist on staff as well as another male gynecologist. (*Id.* at p. 73:6-74:7).

58.    She testified that she undergoes yearly PREA training and that her PREA training is up to date as of the date of her deposition. (*Id.* at p. 46:4-23).

59.    Ms. Hopkins testified that she has extensive experience recognizing the signs of abuse and inappropriate behavior and would have no issues reporting the concerns to her supervisor. (*Id.* at p. 51:11-24; 52:10-17; 55:9-56:4; 59:3-60:13. 61:17-24; 68:8-69:1).

60.    She also stated she is familiar with her obligations under PREA and follows those obligations in terms of reporting instances of sexual assault or abuse. (*Id.* at p. 156:16-23).

61.    She explained that all gynecological procedures require patient consent, and she has never had an encounter at Lowell CI where a provider has performed an examination that was not consented to. (*Id.* at p. 64:11-25; 66:9-24).

62.    Ms. Hopkins further testified that she has never felt uncomfortable providing or chaperoning any medical treatment rendered at Lowell CI. (*Id.* at p. 69:2-11).

63.    Ms. Hopkins testified that pursuant to the rules, a female assistant was always present in the room during gynecological examinations, regardless whether the provider was male or female, but there was a known rule that a male was not to be alone in the examination room with a female inmate. (*Id*. at p. 74:23-75:18).

64.    As it pertains to her standard practice and procedure when working with Dr. Benoit, Ms. Hopkins explained that she stood in the same spot for every examination: directly beside Dr. Benoit or directly on top of his shoulder when he performed PAP smears on patients, and at a vantage point where she could see exactly what he was doing during a gynecological procedure. (*Id*. at p. 103:9-23; 104:11-105:1-5; 111:1-6; 112:12-115:15; 151:21-25).

65.    She confirmed that she has assisted Dr. Benoit with over 1000 Pap smear procedures over the years and hundreds of colposcopies and breast examinations. (*Id*. at p. 110:6-9; 122:18-123:15)

66.    Ms. Hopkins adamantly denied the allegations made by the Plaintiffs in this case and confirmed she has never seen or heard Dr. Benoit act inappropriately with a patient. (*Id*. at p. 152:2-154:1; 154:10-22; 155:3-156:7)

67.    Ms. Hopkins concluded her deposition by confirming that she has never witnessed any inappropriate behavior by Dr. Benoit and if she had witnessed such behavior she would have reported it. (*Id*. at p. 159:15-24).

68.     She has never had any inmate at Lowell CI ever tell her that they were sexually assaulted by Dr. Benoit during a gynecological appointment. (*Id.* at p. 160:12-20).

69.     Ms. Hopkins also testified that inmate refusals for gynecological care have not decreased since Dr. Benoit's departure, even with the inclusion of a female gynecological provider. The number of refusals has remained the exact same. (*Id.* at p. 161:2-19).

*Tina Matamoros*

70.     Ms. Matamoros is a certified nursing assistant currently employed at Marion Correctional Institution. She has been a provider with Centurion since 2016. (Exhibit P at p. 9:22-10:2; 20:5-12).

71.     When she started working at Lowell CI in 2016, Dr. Benoit was not working at the facility. She assisted a different female provider with gynecological examinations. (*Id.* at p. 12:19-13:1).

72.     She confirmed that she is trained in PREA by Centurion and that her training occurs annually. (*Id.* at p. 57:9-59:4; 59:11-12; 60:11-61:6).

73.     Ms. Matamoros testified that there is always a female chaperone in the room during gynecological examinations, regardless of whether the provider is a male or a female. (*Id.* at p. 13:17-14:10-24).

74.     Ms. Matamoros assisted Dr. Benoit with roughly 500 gynecological examinations, seeing on average 15 patients a day for five days a week. (*Id.* at p. 17:3-18).

14

75.     Ms. Matamoros testified about her standard practice and procedure when assisting Dr. Benoit with his gynecological examinations. She stated she is always standing next to him. (*Id.* at p. 20:13-21:17).

76.     Ms. Matamoros testified that part of her role as a chaperone was to protect the patient, herself, and the doctor, to make sure there is no misunderstanding of what is happening. (*Id.* at p. 23:12- 24:20).

77.     As the chaperone for Ms. Luongo's appointment with Dr. Benoit on January 8, 2021, Ms. Matamoros vehemently denied Ms. Luongo's allegations that Dr. Benoit acted inappropriately. If she had witnessed such behavior, she would have remembered it and would have reported it. (*Id.* at p. 25:23-27:12).

78.     Ms. Matamoros was also asked a series of questions detailing the allegations against Dr. Benoit and whether Ms. Matamoros had observed or witnessed them in the hundreds of examinations she assisted with Dr. Benoit. She denied all of them. (*Id.* at p. 28:11-31:2; 31:3-6, 22-25).

79.     Importantly, no patient has ever told her that they felt Dr. Benoit was inappropriate during an examination and no inmate ever reported that the examination resulted in sexual assault. (*Id.* at p. 31:7-17; 73:10-18).

80.     Ms. Matamoros stated that if she had witnessed or observed inappropriate behavior during a gynecological examination, she would have reported it. (*Id.* at p. 71:15-72:12).

*Other Centurion Providers/Chaperones*

81.    In addition to Hannalore Booe, LPN, former and current Centurion providers, Cindy Sarduy, APRN, Danielle Harper, RN, and Twilia Johnson, LPN, and Connie Crews, RN have submitted sworn declarations. (Exhibit V; Exhibit Y; Exhibit Z;  Exhibit X).

82.    All of these nurses have worked with Dr. Benoit and served as chaperones for gynecological procedures during their respective times working at Lowell CI. (*Id.*)

83.    All of these nurses confirmed that Centurion had and has a practice and procedure of requiring a female chaperone in all gynecological examinations at Lowell CI. (*Id.*)

84.    All of these nurses confirmed that they were/are trained by Centurion annually in PREA and were/are familiar with their reporting obligations and adhere(d) to them. (*Id.*)

85.    None of these nurses have ever been told by any of the Plaintiffs' or other inmates at Lowell CI that they were sexually assaulted or abused by Dr. Benoit. (*Id.*)

86.    If an inmate had reported any allegations of abuse or assault to them, all of these nurses would have reported it, pursuant to their PREA training. (*Id.*)

*Sabrina Midea Lambert*

87.    Ms. Lambert is a current Centurion employee and serves as an administrative assistant at Lowell CI. (Exhibit Q at p. 17:15-18:25).

88.    Ms. Lambert testified that all Centurion providers and contractors undergo annual PREA training. (*Id*. at p. 30:7-33:1; 54:7-55:7).

89.    As an administrative assistant, Ms. Lambert is tasked with keeping track of all providers' annual PREA training and making sure every provider has completed the training annually. (*Id*. at p. 35:16-24; 56:9-21).

90.    Apart from herself, the facility has a PREA compliance officer that oversees PREA training and compliance. The individual is an FDC employee. (*Id*. at p. 57:3-13).

91.    When staff report a PREA incident, there is always a paper trail, including PREA documentation and a report. (*Id*. at p. 46:21-49:3).

92.    The PREA process is the same whether the person accused is a prisoner, corrections Officer, or Centurion employee. (*Id*. at p. 59:3-14).

93.    As it pertains to Dr. Benoit, Ms. Lambert has never heard about any allegations of sexual assault against Dr. Benoit. (*Id*. at p. 65:12-15; 122:13-123:3; 123:17-22; 124:24-125:8; 126:16-127:2).

94.    Ms. Lambert has never heard of any sexual abuse allegations against any Centurion employee or contractor. (*Id*. at p. 67:3-14).

95.    Apart from her deposition in this lawsuit, Ms. Lambert confirmed that she has <u>never</u> been a part of any conversations or meetings concerning inappropriate behavior or allegations of sexual abuse against Dr. Benoit. (*Id*. at p. 67:23-68:5-11).

*Rosalynn Hamilton, APRN*

17

96.     Ms. Hamilton is a former medical provider at Lowell CI, employed by Maxim, a staffing contractor with Centurion to provide medical care to inmates. (Exhibit R at p. 12:20-13:5).

97.     Ms. Hamilton is an advanced practice registered nurse licensed in Florida who worked at Lowell CI from June 2023 until September 2024. (*Id.* at p. 13:23-14:11; 17:22-18:15; 18:21-19:18).

98.     She was originally hired to assist with general family care but was asked to assist with some gynecological care as well. (*Id.* at p. 23:11-24:18).

99.     Ms. Hamilton testified that she worked with Dr. Benoit and assisted him on a few occasions with patients. She recalled that he had an assistant/chaperone for all invasive procedures, and that she did chaperone for Dr. Benoit for two breast examinations. (*Id.* at p. 37:10-22).

100.    While she was at Lowell CI, Ms. Hamilton recalled that one patient, Ethel Anderson, did tell her she did not want to see Dr. Benoit, in or around August or September of 2024. This patient told her she had an active lawsuit against Dr. Benoit, and it was after Dr. Benoit had left Lowell CI. (*Id.* at p. 43:10-45:7; 56:14-22).

101.    Apart from Ms. Anderson in August/September 2024, Ms. Hamilton was never informed by any patients of inappropriate behavior by Dr. Benoit. (*Id.* at p. 47:24-49:10).

102.    While working at Lowell CI, Ms. Hamilton never had a concern that
Dr. Benoit was sexually abusing patients, and she never heard from anyone that
Dr. Benoit was abusing patients. (*Id*. at p. 51:6-54:3; 54:14-17).

103.    As a contractor, Ms.  Hamilton was familiar with the PREA and the
PREA policies and was trained on how to report a PREA incident. (*Id*. at p. 61:14-
62:6; 63:13-21; 64:8-13).

*Vicki Love- Centurion Corporate Representative*

104.    On June 17, 2025, Centurion's Corporate Representative was deposed
for seven hours by counsel for Plaintiffs.

105.    Ms. Love serves as the corporate operative lead of Centurion's
contract with the FDC, ensuring Centurion is meeting the contractual
requirements. (Exhibit S at pp. 20:4-22:5).

106.    Ms. Love testified that all Centurion providers follow the FDC's
protocol and are trained to report allegations of sexual abuse or misconduct
pursuant to PREA.  (*Id*. at pp. 40:2-7; 40:25-43:12; 46:8-15; 48:21-49:25; 51:3-9;
52:7-54:19; 56:4-9).

107.    Pursuant to the contract with the FDC, the OIG is the entity that
investigates allegations of sexual abuse even if it is made against a Centurion
employee. (*Id*. at pp. 81:5-21; 90:14-22)(Exhibit B).

108.    Ms. Love testified that Centurion does not have involvement in the
investigations of the OIG, apart from its providers providing interviews and

witness statements as directed by the OIG. Centurion as an entity is not involved.
(Exhibit S at pp. 85:25-86:18.)

109.    Ms. Love testified that the OIG investigations are confidential and that
Centurion would not receive any documents relating to the OIG investigation apart
from a final report, and then only if the OIG opted to provide one. (*Id*. at pp. 89:25-
90:15).

110.    Upon completion of the investigation, and only if the OIG notifies
Centurion of the results of the investigation, does a Human Resources personnel
review the findings and place the investigation report in the employee's personnel
file. If the results of the investigation are "unfounded" or "suspended" likely no
adverse employment actions would occur against that employee. (*Id*. at pp. 94:10-
96:5; 102:15-103:2).

111.    However, in this instance, Ms. Love is not aware of any evidence that
the OIG informed Centurion of the investigation or the findings of any PREA
investigations involving Dr. Benoit. (*Id*. at pp.  135:1-4; 137:5-8; 1421:24-142:16;
145:3-6; 147:5 148:3; 149:10-14; 151:1-12; 153:24-155: 9; 157:20-159:2;  163:3-7;
174:11-14).

112.    Even still, Centurion would only take adverse employment action
against Dr. Benoit should the OIG investigation findings be founded or
substantiated, and Centurion has no evidence that any of the OIG investigations of
Dr. Benoit were substantiated or founded. (*Id*. at pp. 101:5-19).

113.    Ms. Love confirmed that once Centurion became aware of the allegations in this lawsuit, Centurion decided to suspend Dr. Benoit with pay, pending the legal investigation of this lawsuit. (*Id.* at pp. 193:3-8; 194:1-21).

114.    Given the anticipated length of the investigation and this lawsuit, the decision to terminate Dr. Benoit's employment was made. However, he submitted his resignation prior to formal termination. (*Id.* at pp. 199:25-200:24).

115.    Ms. Love confirmed that Centurion is in compliance with its FDC contract requirements as it pertains to following and adhering to the FDC's PREA policies and procedures. (*Id.* at pp. 230:1-4).

*The Evidence Obtained in Discovery*

116.    In this litigation, Centurion has produced over 75,000 documents of Electronically Stored Information to Plaintiffs in discovery.

117.    This ESI included emails and attachments spanning across over dozens of custodians for a time period of 2018- 2024.

118.    In the entirety of this ESI production, there is no evidence that any inmates reported sexual assault allegations to Centurion and that Centurion failed to report or follow the PREA requirements under FDC Procedure 602.053.

119.    Additionally, all reported PREA allegations were investigated by the OIG, pursuant to FDC Procedure 602.053, and all investigations involving Dr. Benoit returned unfounded or unsubstantiated.

███████████

120.   On December 18, 2018, ████████████████████████

████████████████████████████████████████

████████████████████████████ (Exhibit AA).

121.   ████████████████████████████████

████████████████████████████████████████

████████████████████████████████ (*Id.*);(Exhibit G

at p, 383-446).

122.   After the PREA paperwork was completed, an OIG investigation

ensued ██████████████████████████████████

█████████████████████

████████████████████████████████████████
████████████████████████████████

(*Id.* at p. 393).

123.   The OIG investigated, ████████████████████

████████████████ and determined the allegations were ████████ (*Id.* At p.

394-396)(emphasis added).

████████████████

124.   On July 28, 2020, ██████████████████████████

████████████████████████████████████████

████████ (Exhibit G at p. 246-339).

125.   ████████████████████████████████████████

████████

126.    During the investigation the OIG ███████████████████████

████████████████████████████████████████████ (*Id.*).

127.    ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

(*Id.* at p. 262).

128.    ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████    (*Id.*)

129.    The OIG returned a disposition of ████████████████████

███████████████████████████████████████    (*Id.*)(emphasis

added).

*Christi Sanseverino*

130.    Three  years  later,  ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████    (Exhibit T).

131. ███████████████████████████████████████████

███████████████████████████ (*Id.*)

132. However, ████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████ (*Id.*).

████████████

133. Four months later, ████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████

134. █████████████████████████████████████

████████████

135. The OIG investigated, ███████████████████████████

██████████████████████████████████████ (Exhibit G at

p. 120-131).

136. █████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████ (*Id.*)

137. █████████████████████████████████████

███████████████████████████████████████ (*Id.*)

138.   The OIG completed the investigation and returned the finding of

██████████████████████████ (*Id.*)

*Remaining PREA Reports*

139.   All the remaining PREA reports against Dr. Benoit were reported ██

████████████████████████████████████ in anticipation

or in furtherance of filing this lawsuit.[10] (Exhibit F and U).

*Luongo*

140.   ████████████████████████████████

████████████████████████ (Exhibit F at p. 10-

15).

141.   The OIG initiated an investigation, which included ███████████

██████████████ (Exhibit G at p. 340-382).

142.   The OIG rendered a finding of ████████████████

(Exhibit G at p. 340-382).

*Crowley*

143.   ████████████████████████████████

████████████████████ (Exhibit F at p. 1-

9).

---

[10] ████████████████████████████████
████████████████████████████████
████████████████

144.    The OIG initiated an investigation, which included ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████

(*Id.*)

145.    On April 4, 2024, the OIG found ████████████████

████████████████████████████████████████████████

███████████████ (Exhibit G at p. 164-208).

████████

146.    ████████████████████████████████████████

███████████████████████████████ (Exhibit F at p. 25-

30).

147.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ (Exhibit G at p. 132-163).

148.    The OIG found that the ████████████████████

███████████████████████████████████████ (*Id.*)

*Anderson*

149. ███████████████████████████████████████████

██████████████████████████████████ (Exhibit F at p. 16-24).

150. The OIG investigated, ████████████████████████████

████████████████████████████████ rendered a finding of

███████████████████ (Exhibit G at p. 34-119).

███████

151. ███████████████████████████████████████████

████████████████████████████████ (Exhibit F at p. 33-36).

152. ███████████████████████████████████████████

███████████████████ (Exhibit G at p. 209-245).

153. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████ (*Id.*)

154. The OIG completed the investigation ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████ (*Id.*)

███████

155. ███████████████████████████████████

███████████████████████████████████ (Exhibit F at p. 31-

32).

156. ███████████████████████████████████

███████████████ (Exhibit G at p. 447-475).

157. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████ (*Id.*)

158. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████ (*Id.*)

159. ███████████████████████████████████

███████████████████████████████████████

(*Id.*)

160. 

(*Id.*)

161.    On April 5, 2024, the OIG rendered a finding of ██████████

████████████████████████████████████████████████████

███████████████████████ (*Id.*)

*Dr. Benoit Suspension and Termination*

162.    This lawsuit was filed against Defendant Dr. Ader Benoit on February 23, 2024. An Amended Complaint was filed on March 13, 2024.

163.    On March 25, 2024, Centurion made the decision to suspend Dr. Benoit with pay, pending the investigation of this lawsuit.

164.    After that date, Dr. Benoit did not return to Lowell CI and later resigned on June 4, 2024.

**STANDARD OF REVIEW**

Defendant initially has the burden to demonstrate an absence of evidence to plaintiff's case. *Celotex Corporation v. Catrett*, 477 U.S. 317 (1986). The burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact. *Id.* Where the Plaintiff's version "is so utterly discredited by the record that no reasonable jury could have believe her," the court does not have to rely "on such visible fiction" and should not adopt that version for purposes of summary judgment. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

"Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records." *Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010).

## MEMORANDUM OF LAW

**I.     Plaintiff Anderson is Outside the Statute of Limitations to Bring a § 1983 Deliberate Indifference Claim against Centurion.**

Since there is no applicable federal statute of limitations relating to civil rights actions brought pursuant to § 1983, such actions are governed by the forum state's residual personal injury statute of limitations. *Chappell v. Rich*, 340 F.3d 1279, 1283 (11th Cir. 2003). In Florida, at the time Plaintiff's action accrued, the limitations period for personal injury actions was four years. *See*, Fla. Stat. § 95.11(4)(a). A cause of action under § 1983 accrues when the injured party knows or should know (1) that she has suffered the injury that forms the basis of a claim and (2) who has inflicted the injury. *Chappell*, 340 F.3d at 1283; *Lovett v. Ray*, 327 F.3d 1181, 1182 (11th Cir. 2003).

In this instance, the evidence confirms that Plaintiff Ethel Anderson saw Dr. Benoit on February 1, 2019, ███████████████████████████████ ████████████████████████████████ (Exhibit D). During this appointment, she contends she was assaulted by Dr. Benoit. It is therefore clear that the action accrued on the date as she contends she suffers an assault by Dr. Benoit. *Chappell*, 340 F.3d at 1283. However, Plaintiff Anderson filed the instant action on February 23, 2024, over five years after her alleged injury. Thus, Plaintiff is well outside the

four-year statute of limitations to bring a § 1983 deliberate indifference claim, stemming from her 2019 appointment with Dr. Benoit. Accordingly, her claim is time-barred, and Centurion is entitled to summary judgment on that claim and any injuries or damages sustained from the 2019 incident.

## II.   There Are No Issues of Material Fact As To Plaintiffs' Eighth Amendment Claim Against Centurion.

The Supreme Court has held that prison officials violate the bar on cruel and unusual punishments only when they display "deliberate indifference to serious medical needs of prisoners." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1265 (11th Cir. 2020) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). For decades, the Eleventh Circuit has described a "more than mere negligence" or "more than gross negligence standard" in determining whether an official acted with deliberate indifference to that serious medical need. *See Hoffer v. Sec'y, Fla. Dep't of Corr.,* 973 F.3d 1263, 1270 (11th Cir. 2020) ("To establish deliberate indifference, a plaintiff must demonstrate that the prison officials (1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) acted with more than gross negligence.") (internal quotations omitted)); *see also Wade v. McDade*, 2024 WL 3354963, at *2 (11th Cir. July 10, 2024).

Recently, however, the Eleventh Circuit determined that those standards conflicted with the Supreme Court's decision in *Farmer* and clarified that courts in this circuit should apply the "subjective recklessness standard" as used in criminal law. *See Id.* at *1; *Farmer v. Brennan*, 511 U.S. 825, 839 (1994). Specifically, the

Eleventh Circuit has instructed that to establish liability on an Eighth Amendment deliberate indifference claim, the plaintiff must show first, that she suffered a deprivation that was, "objectively, 'sufficiently serious'" and second, that the defendant acted with "subjective recklessness as used in the criminal law." To demonstrate "recklessness as used in the criminal law" a plaintiff must show that the defendant was actually, subjectively aware that their own conduct caused a substantial risk of serious harm to the plaintiff and even if the defendant "actually knew of a substantial risk to inmate health or safety," they "cannot be found liable under the Cruel and Unusual Punishments Clause" if he "responded reasonably to the risk." *Farmer*, 511 U.S. at 834, 39, 44-45); *Wade,* 2024 WL 3354963, at *7.

Thus, "[a]s applied in the prison context, the deliberate-indifference standard sets an appropriately high bar." *Swain v. Junior,* 961 F.3d 1276, 1285 (11th Cir. 2020). Indeed, the law is well settled that the Constitution is not implicated by the negligent acts of corrections officials and medical personnel. *Daniels v. Williams*, 474 U.S. 327, 330-31 (1986); *Davidson v. Cannon*, 474 U.S. 344, 348 (1986) ("As we held in *Daniels,* the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials.")." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (citation omitted).

An employer serving a government function, like Centurion of Florida, LLC, is not vicariously liable under § 1983 when its employees violate a person's constitutional rights. *See Connick v. Thompson*, 563 U.S. 51, 60, (2011) ("But, under § 1983, local governments are responsible for their own illegal acts. They are

not vicariously liable under § 1983 for their employees' actions."). Instead, "a municipality may be held liable for the actions of [its employees] only when municipal 'official policy' causes a constitutional violation." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694–95, (1978)). In order "to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388, (1989)). The Supreme Court has held that "[o]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policy making officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61 (citing *Monell*, 436 U.S. at 691, 98 S.Ct. 2018); *see also Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc) ("A plaintiff … has two methods by which to establish a [municipal] policy: identify either (1) an officially promulgated [municipal] policy or (2) an unofficial custom or practice of the [municipality] shown through the repeated acts of a final policymaker for the [municipality]."). Therefore, a municipality may be held liable "only if such constitutional torts result from an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." *Denno v. Sch. Bd. of*

*Volusia County, Fla.,* 218 F.3d 1267, 1276 (11th Cir.2000). Actual or constructive knowledge of such customs or practices must be attributed to the governing body of the municipality and random acts or isolated incidents are insufficient to establish a custom or policy. *Depew v. City of St. Marys, Georgia,* 787 F. 2d 1496, 1499 (11th Cir. 1986). The custom must be such "a longstanding and widespread practice that it is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Craig v. Floyd County, GA,* 643 F.3d 1306, 1310 (11th Cir. 2011). Likewise, allegations of unlawful customs, policies, and practices against separate legal entities is insufficient to establish unlawful customs, policies, and practices on a separate and different legal entity. *Depew*, 787 F. 2d at 1499.

Here, Plaintiffs contend that Centurion was deliberately indifferent towards them through an alleged unconstitutional custom or practice of allowing inmates at Lowell CI to be sexually assaulted by Dr. Benoit. Of course, Plaintiffs cannot contend Centurion has an actual or official policy endorsing sexual assault of inmates at Lowell CI. Rather, all of the evidence confirms that Centurion and its employees endorse and follow the FDC PREA Procedure, or 602.053, that sets forth a "zero tolerance" policy on sexual abuse in the prison system. Thus, Plaintiffs' case hinges upon proving that Centurion endorsed an "unofficial" policy or practice of allowing inmates at Lowell CI to be sexually assaulted by Dr. Benoit. To succeed on this theory, Plaintiffs would need to present evidence demonstrating that: (1) inmates at Lowell CI were sexually assaulted by Dr. Benoit; (2) that Centurion knew

about this sexual abuse by Dr. Benoit and failed to take reasonable measures to correct the alleged abuse and (3) that such failure caused Plaintiffs' injuries. Based upon the enormous evidence in this case, it is abundantly clear that Plaintiffs are unable to present any evidence to support this claim.

### a.    Plaintiffs are unable to demonstrate that their constitutional rights were violated.

To begin, apart from the allegations of the Plaintiffs themselves, there is no evidence corroborating that Dr. Benoit committed sexual assault or abuse upon Plaintiffs, or any others, while working at Lowell CI.  Plaintiffs hinge their entire claim on the ten OIG reports and/or investigations of Dr. Benoit, a majority of which were filed in anticipation of this lawsuit. However, all these reports returned findings of unsubstantiated or unfounded after a thorough investigation by the FDC OIG. By Plaintiffs' own admissions, ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████ (Exhibit L). Thus, Plaintiffs have failed to meet their initial burden of demonstrating that their constitutional rights were actually violated.

### b.    Plaintiffs cannot establish Centurion had a custom or policy that constituted deliberate indifference to a constitutional right.

However, even assuming Plaintiffs' *could* set forth evidence of a disputed fact as to whether their constitutional rights were violated by Dr. Benoit, they still

cannot set forth evidence to succeed on a claim against Centurion. Indeed, Plaintiffs cannot show evidence that Centurion had an unconstitutional custom or practice of allowing sexual assault and abuse by Dr. Benoit to occur at Lowell CI. Plaintiffs solely rely upon the mere existence of ten PREA investigations as the basis to support this contention, but, as discussed in detail below, they are unable to proffer evidence to support that the existence of these isolated, unfounded, and unsubstantiated PREA reports alone arises to a "widespread" and "systemic" custom of sexual abuse under the Eighth Amendment. Indeed, conspicuously absent from the record is evidence of a single instance in which Centurion tolerated or approved of sexual misconduct by Dr. Benoit.

First, the undisputed factual record confirms that Centurion had a policy and practice of requiring a female chaperone to be present during all gynecological examinations of inmates, including those of all five Plaintiffs. Second, Centurion had a clear policy of following the FDC's PREA procedure on sexual abuse and that Centurion had instituted a policy and practice of requiring annual PREA training for all of its providers and contractors. Third, pursuant to that policy and training, all reports of allegations of sexual misconduct automatically trigger a formal PREA investigation by the FDC through the OIG. The OIG interviews witnesses, gathers relevant documents, and prepares a written report and findings. Pursuant to FDC Procedure 602.053, each time a claim of sexual abuse is sustained, the offending individual is punished accordingly, including discipline, termination, and possible criminal action. *See*, 602.053(9)(e).

Fourth, none of the ten PREA reports involving Dr. Benoit were, after thorough investigation, sustained or founded. The lack of a single substantiated report is fatal to Plaintiffs' case. That is because this Circuit has made clear that to prove a widespread pattern of constitutional violations, the Court requires more than evidence of unsubstantiated allegations.

In an analogous case, a plaintiff brought a deliberate indifference claim against the County for failing to protect plaintiff, and other minors, from sexual assault by police officers. *Doe v. Miami Dade County,* 797 F.Supp.2d at 1310 (11th Cir. 2011). The County moved for summary judgment and the Court granted the motion on the basis that the plaintiffs could not establish deliberate indifference. (*Id*). Specifically, the Eleventh Circuit opined that the plaintiff's attempt to impute knowledge on the County by drawing attention to 51 prior sexual misconduct claims against officers over four years, was insufficient to establish a widespread pattern of constitutional abuses. (*Id*. at 1310). Specifically, the Court opined that that many if not most, of the claims of sexual misconduct were, after investigation, "unsustained" and "in judging the scope or existence of a pattern of constitutional violations, the Court requires more than evidence of underscore{accusations}." (*Id*.)

Additionally, other courts in this Circuit have agreed that unsubstantiated complaints of misconduct are insufficient to establish a constitutional pattern and practice of indifference on the part of the municipality. *See, Windham v.* 20 F.Supp.3d 1323 at1344 (S.D. Ala. 2014)(four unsubstantiated complaints about its officers is not sufficient to establish municipal liability); *Mettler v. Whitledge,* 165

F.3d 1197, 1205 (8th Cir.1999) ("[T]he mere existence of previous citizens'
complaints does not suffice to show a municipal custom of permitting or
encouraging excessive force.")(citation omitted); *Brooks v. Scheib,* 813 F.2d 1191,
1193 (11th Cir.1987) (<u>Ten</u> complaints about a single police officer, did not arise to
notice on the part of the City of Atlanta because the plaintiff "never demonstrated
that past complaints of police misconduct had any merit. Indeed, the number of
complaints bears no relation to their validity."); *Whitaker v. Miami-Dade County*,
126 F.Supp.3d 1313, 1321 (S.D. Fla. 2015)("a plaintiff certainly cannot establish a
widespread unconstitutional practice through prior constitutional actions"
however, "even assuming these four isolated incidents in 2012 were deemed to be
unconstitutional uses of excessive force, the Court does not accept Plaintiffs' legal
conclusion that the prior shootings constitute the sort of occurrence that is "
'obvious, flagrant, rampant and of continued duration' " that would establish a "
'causal connection between actions of the supervising official and the alleged
constitutional deprivation.'").

As there were <u>no</u> substantiated findings made against Dr. Benoit, pursuant
to the binding case law, there cannot be an established and widespread practice of
indifference. Rather, in line with the resounding case law, the existence of ten
instances of unsubstantiated allegations of sexual misconduct, over the span of
seven years, in an inmate population of over 3000 women, fails to establish
a widespread pattern of constitutional abuses by Centurion. *Doe,* 797 F.Supp.2d at
1310; *Brooks,* 813 F.2d at 1193; *Whitaker,* 126 F.Supp.3d at 1321. Accordingly, there

is no evidence that Centurion was ever made aware of substantiated claims of sexual

abuse by Dr. Benoit that it then deliberately disregarded.

Even analyzing these unsubstantiated PREA investigations more closely, it

confirms that only <u>two</u> were conducted prior to Plaintiffs' alleged "assaults."

Specifically, the record reflects that these Plaintiffs' alleged assaults by Dr. Benoit

occurred between 2019 and 2022. Prior to that, there were two investigations

involving Dr. Benoit, occurring in 2018 and 2020. ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████ (Exhibit G at p. 383-446 and 246-

339). In both cases, the OIG returned findings of unfounded and/or

unsubstantiated. There is no evidence that Centurion was even notified of these

unfounded PREA investigations. Nonetheless, these two isolated incidents, both

investigated and found unsubstantiated or unfounded, in a population of over 3000

women, over the course of two years, does not constitute a "widespread" and

"systemic" problem of tolerating sexual abuse prior to these Plaintiffs encounters

with Dr. Benoit, under the Eighth Amendment. *Doe v. Sch. Bd. Of Broward

Cty.,* 604 F.3d 1248 (11th Cir. 2010) (finding two isolated incidents of alleged sexual

misconduct by a teacher within a year was insufficient to prove widespread abuse.).

Further, the record then reflects that <u>no</u> inmates, including Plaintiffs,[11] reported any allegations of sexual abuse between 2020 and 2022. The next report and investigation was not made until three years later in ███████ with a fourth report occurring in ████████████. ████████████████████████████ ████████████████████████████████████████ ████████████████ (Exhibit T). Therefore, even including these two additional isolated allegations, in conjunction with the two prior, yields a total of four, all of which were found to be unsubstantiated or unfounded. In context, four unfounded reports, in a population of over 3000 women, over the course of five years, does not arise to a "widespread" and "systemic" problem of sexual abuse under the Eighth Amendment. *Windham,* 20 F.Supp.3d at 1344 (<u>four</u> unsubstantiated complaints about officers in five years preceding Plaintiff's arrest is not sufficient to establish municipal liability. "On this record, no reasonable fact finder could conclude that the City of Fairhope was on notice of a widespread pattern of constitutional deprivations by its police force, which it either ratified or failed and refused to provide adequate training to prevent."); *Braddy*, 133 F.3d at 802; *Doe,* 604 F.3d at 1248.

The record then demonstrates that the remaining seven (7) OIG PREA investigations resulted from reports made between December 19, 2023 and April 11, 2024, six of which were filed by ████████████████████ in

---

[11] No grievances pertaining to Dr. Benoit were ever filed by or on behalf of Plaintiffs Johnson and Meadows.

anticipation of this lawsuit. (Exhibit F). Centurion was only provided with a copy of
these Third-Party Grievances around the time of the filing of the lawsuit, on
February 23, 2024. Upon receipt of the lawsuit and official notice of these
allegations, Centurion made the decision to suspend Dr. Benoit from his
employment, pending its legal investigation. The remaining PREA report was made
on April 11, 2024, ███████████████████████████████████ and *after*
Dr. Benoit had been removed from the facility. (Exhibit G at p. 1-33). The OIG then
conducted its' investigations of these seven reports and rendered findings of
unsubstantiated and/or unfounded for all of them, ████████████████████
████████████████████████ (*Id.*)

Accordingly, it is clear from the record that Centurion appropriately relied
upon and adhered to the policies and procedures set forth by the FDC for PREA
reports and investigations and never disregarded any substantiated reports of
sexual abuse or assault. Pursuant to FDC policy 602.053, neither the FDC nor
Centurion were required to discipline or terminate Dr. Benoit as a result of these
unsubstantiated allegations. Centurion also had a policy and practice of requiring
mandatory annual PREA training for its providers and instituted a system to
confirm compliance with that training. The record also confirms a widespread
practice of having a female chaperone nurse present during all of Dr. Benoit's
gynecological examinations, whose primary if not sole responsibility is to serve as
a patient advocate and protect against sexual assault and abusive conduct. Thus,
there is no evidence of indifference on the part of Centurion. To the extent Plaintiffs

believe the FDC's PREA Procedure and OIG investigations are unconstitutional or deficient, such arguments have no bearing on the claim against Centurion as Centurion cannot be held liable for the customs and practices of separate legal entities, to which they have no control over and were not the official policymaker for.

### c.    Plaintiffs *Monell* claim fails on causation.

Additionally, Plaintiffs' deliberate indifference claim against Centurion fails on causation.  Plaintiffs set forth no evidence demonstrating that any policy or practice of Centurion caused or contributed to Plaintiffs' constitutional deprivation. Rather, as stated, there were only two OIG investigations of allegations against Dr. Benoit, prior to Plaintiffs' purported "assaults", both of which were determined to be unsubstantiated or unfounded. Thus, for Centurion to have caused Plaintiffs' "abuse" it would have needed to have been aware of substantiated allegations of sexual abuse by Dr. Benoit, prior to Plaintiffs' respective "assaults." However, as the evidence has confirmed, there were no substantiated allegations of abuse prior to Plaintiffs' alleged assaults, and there was therefore no knowledge on the part of Centurion as to any substantiated allegations as to require further action. On that basis, Plaintiffs' claims fail on causation.

Nonetheless, the evidence also confirms that during the entirety of Plaintiffs' respective "assaults" Centurion had a clear policy and practice of adhering to the FDC Procedure for PREA reporting and investigations and endorsing a zero-tolerance policy for sexual abuse. Centurion also had a policy and practice of

requiring all employees to undergo annual PREA training and maintained a system for confirming provider compliance with that training. Further, the undisputed testimony confirms that there existed a known policy and practice of requiring a female chaperone to be in the room during all of Dr. Benoit's gynecological examinations. As such, Plaintiffs cannot set forth any evidence that Centurion caused or contributed to any alleged sexual abuse or that further action would have prevented alleged abuse or found evidence of patient harm where the detailed investigations of the OIG found none. Accordingly, summary judgment in Centurion's favor is warranted.

### III.    Plaintiffs Are Not Entitled to Punitive Damages.

Additionally, Plaintiffs fail to proffer evidence to sustain a claim for punitive damages against Centurion. Plaintiffs cannot set forth any evidence demonstrating that Centurion endorsed an unconstitutional policy or procedure that was motivated by evil motive or intent or involved reckless or callous indifference to the federally protected rights of others. *Hooks v. Brewer*, 818 F. App'x 923, 931 (11th Cir. 2020) (quoting *Smith v. Wade*, 461 U.S. 30, 55 (1983)). Rather, as discussed, the record reflects that Centurion never endorsed a policy of deliberate indifference and did not cause or contribute to any constitutional injury on the part of any Plaintiff. As Plaintiffs cannot sustain a claim of deliberate indifference against Centurion, they also cannot proffer evidence of actions on the part of Centurion that rise to the level of being evil, reckless, or callously indifferent as to entitle them to punitive damages. As such, summary judgment should be granted.

43

### IV.    Plaintiffs' Claim for Injunctive and Declaratory Relief is Moot.

Finally, Plaintiffs seek injunctive and declaratory relief from this Court in the form of allowing Plaintiffs to see a different provider for gynecological care at Lowell CI. However, as stated, Dr. Benoit resigned from Lowell CI and is no longer a medical provider at the institution. Further, Centurion is not the official policy maker for FDC and is in no position to institute Plaintiffs' demanded changes within the correctional system. Therefore, Plaintiffs' requested relief is moot. *Miccosukee Tribe of Indians of Fla. v. United States*, 259 F. Supp. 2d 1237, 1243 (S.D. Fla. 2003), *aff'd sub nom.*, *Miccosukee Tribe v. United States*, 103 F. App'x 666 (11th Cir. 2004) (dismissing a claim for injunctive relief as moot where the plaintiff "already received the injunctive relief requested"); *Pratt v. Thomas*, No. 2:12-CV-52, 2012 WL 1252841, at *2 (M.D. Ala. Mar. 20, 2012), *report and recommendation adopted*, 2012 WL 1252707 (M.D. Ala. Apr. 13, 2012) ("[Plaintiff] has received the requested relief—alleviation from the conditions present in the prison system. Consequently, any request for injunctive or declaratory relief is subject to dismissal as moot."). Accordingly, summary judgment is further warranted.

### CONCLUSION

In sum, Plaintiffs are unable to support their claims that Centurion violated their Eighth Amendment rights based on deliberate indifference because the evidence fails to show a constitutional violation, indifference on the part of

Centurion, causation, and/or injury attributable to Centurion. They also fail to set forth any evidence entitling them to compensatory, punitive, or nominal damages and injunctive or declaratory relief.

**WHEREFORE**, Defendant, Centurion of Florida, LLC, respectfully requests that the Court enter an Order granting final summary judgment in its favor together with such other and further relief as the Court deems just and appropriate.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 10, 2025, I certify that I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a Notice of Electronic Filing to counsel of record.

/s/ *Rachel E. Eilers*
Ethen R. Shapiro (FBN 669881)
Rachel E. Eilers (FBN 1019587)
Hill Ward Henderson
P.O. Box 2231
Tampa, FL 33601-2231
(813)221-3900, (813)221-2900 (fax)
Ethen.Shapiro@hwhlaw.com
Rachel.Eilers@hwhlaw.com
*Attorneys for Defendant Centurion of*
*Florida, LLC*