UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

**ETHEL ANDERSON, et al.,**

     Plaintiffs,

**v.**

     Case No: 5:24-cv-89-WFJ-PRL

**CENTURION OF FLORIDA LLC,
et al.,**

     Defendants.

## ORDER

Before the Court is Defendant Centurion of Florida LLC's ("Centurion") Motion for Summary Judgment. Dkt. 109.[1] Plaintiffs filed a Response in Opposition, Dkt. 141, and Centurion replied. Dkt. 150.[2] On November 6, 2025, the Court held a hearing on various pending motions. *See* Dkt. 158. Plaintiffs and Centurion subsequently filed rebuttal briefs at the Court's request following the omnibus hearing. Dkts. 159, 160. After careful consideration, the Court grants in part and denies in part Defendant Centurion's Amended Motion for Summary Judgment.

---

[1] Citations to sealed docket entries will appear as "S-Dkt. __." The docket reflects that Centurion also filed a sealed and unredacted motion for summary judgment. *See* S-Dkt. 115.
[2] The docket reflects that Plaintiffs also filed a sealed and unredacted response in opposition. *See* S-Dkt. 149.

## BACKGROUND[3]

Plaintiffs Ethel Anderson, Wanda Meadows, Jacqueline Luongo, Jennifer Johnson, and Virginia Crowley, former and current inmates in the custody of the Florida Department of Corrections ("FDC"), initiated this action against Defendant Centurion following alleged sexual assaults by one of its medical providers. *See* Dkt. 5. Plaintiffs generally alleged violations of their Eighth Amendment rights, claiming that (co-Defendant) Dr. Ader Benoit sexually assaulted them during scheduled gynecological appointments at Lowell Correctional Institution ("Lowell CI"). Dkt. 5 at 1.[4] Plaintiffs claim that Centurion, the Florida Department of Corrections' contracted medical provider at Lowell CI, has an unlawful policy, practice, and custom that is deliberately indifferent to a substantial risk of serious harm from sexual assault by Dr. Benoit. *Id.* at 2.

Centurion is a contractor engaged by the FDC to provide medical care and treatment to inmates at contractually specified locations, including Lowell CI. S-Dkt. 115 at 5. Pursuant to the contract with the FDC, all Centurion providers are required to comply with the policies and procedures set forth by the Department and the Office of Health Services, including those concerning the Prison Rape Elimination Act ("PREA"), 34 U.S.C. §§ 30301, *et seq. Id.*

---

[3] The factual background is taken from the parties' statement of undisputed and disputed facts. *See* S-Dkt. 115 at 4–29; S-Dkt. 149-1.
[4] All page citations in this Order are to the PDF page numbers automatically generated by CM/ECF.

To comply with PREA, the FDC has promulgated Procedure 602.053, the "Prison Rape: Prevention, Detection, and Response" procedure, which prison officials and contractors must follow. *Id.*; *See* Dkt. 109-1. When an inmate files a complaint pursuant to Procedure 602.053, the Florida Office of the Inspector General ("OIG") investigates the alleged sexual abuse, sexual battery, or staff sexual misconduct pursuant to Florida Statute § 944.31. Dkt. 115 at 6; Dkt. 109-1 at 10–11. Once the investigation is complete, OIG issues a "PREA Investigative Report" (hereinafter "PREA report") summarizing the investigation's findings. Dkt. 109-1 at 17. The final PREA report may result in one of the following "investigative conclusions:" exonerated, sustained, partially sustained, not sustained, unfounded, closed by arrest, exceptionally cleared, or placed in suspended status. *Id.* at 30 (showing FDC Procedure 108.015 discussing the possible investigative conclusions).[5] The PREA report will also make a "PREA finding" of substantiated, unsubstantiated, or unfounded. *See* 28 C.F.R. § 115.73(a) ("Following an

---

[5] Procedure 108.015 defines some of these investigative conclusions:

> Exonerated . . . a finding in an administrative case for which a preponderance of evidence exists to suggest the subject's behavior or action did occur and was consistent with Department procedure, rule, or other authority. . . .
>
> Not Sustained . . . a finding in an administrative case for which a preponderance of evidence does not reasonably establish the subject's behavior or action either complied with or violated or was contrary to Department procedure, rule, or other authority. . . .
>
> Suspended . . . a disposition of a criminal case for which a criminal investigation commenced, but where evidence is insufficient to close as unfounded, closed by arrest, or exceptionally cleared.
>
> Sustained . . . a finding in an administrative case for which a preponderance of evidence exists to suggest the subject's behavior or action did occur and was contrary to Department procedure, rule, or other authority.

Dkt. 109-1 at 21–24.

investigation into an inmate's allegation that he or she suffered sexual abuse in an agency facility, the agency shall inform the inmate as to whether the allegation has been determined to be substantiated, unsubstantiated, or unfounded."). Federal regulations provide the following definitions for the three PREA findings:

> Substantiated allegation means an allegation that was investigated and determined to have occurred. . . .
>
> Unfounded allegation means an allegation that was investigated and determined not to have occurred.
>
> Unsubstantiated allegation means an allegation that was investigated and the investigation produced insufficient evidence to make a final determination as to whether or not the event occurred.

28 C.F.R. § 115.5.

Importantly, as it relates to Centurion and its employees, when one of its medical providers or staff members is the subject of an OIG investigation following an inmate complaint, Centurion routinely receives copies of the PREA report upon completion of OIG's investigation. S-Dkt. 149-1 ¶¶ 108, 110. In this record, approximately thirteen female inmates at Lowell CI reported that Dr. Benoit sexually abused them during gynecological appointments. *Id.* ¶ 165. These complaints resulted in ten PREA reports (including reports for Plaintiffs Anderson, Luongo, and Crowley) following an OIG investigation.[6] *Id.* ¶ 119. Of these ten PREA reports,

---

[6] There were no OIG investigations or PREA reports for Plaintiffs Johnson and Meadows' allegations, as they never filed a grievance against Dr. Benoit until after litigation began. S-Dkt. 149-1 ¶¶ 50, 53, 54. The other PREA reports in the record are from women who are not plaintiffs in this case, including Nilufer McCoy, Lorely Lafont, Christi Sanseverino, Sara Bigler, Heather Ciambrone, Frances Gibson, and Kimberly Rodrigues. *See* S-Dkt. 115 at 22–29.

five were "suspended," four were deemed "unfounded," and one the OIG declined to investigate. *Id.*; *see* S-Dkt. 115-5 (showing the PREA reports). Specifically, the PREA report for Plaintiff Anderson's alleged sexual assaults in February 2019 and March 2020 was found to be "unsubstantiated," with the investigation being "suspended." S-Dkt. 115-5 at 51. The PREA report for Plaintiff Luongo's alleged sexual assault in January 2021 was found to be "unsubstantiated," with the investigation being "suspended." *Id.* at 356. The PREA report for Plaintiff Crowley's alleged sexual assault in 2022 was found to be "unsubstantiated," with the investigation being "suspended." *Id.* at 183.

On March 25, 2024, after litigation commenced, Centurion finally suspended Dr. Benoit from seeing any patients, pending the outcome of this lawsuit. S-Dkt. 115-5 at 29. Dr. Benoit later resigned from Centurion on June 4, 2024. *Id.*; S-Dkt. 144-5 at 4 (showing Dr. Benoit's resignation letter).

The instant lawsuit was filed against Defendants Dr. Benoit and Centurion on February 23, 2024. Dkt. 1. An Amended Complaint was filed on March 13, 2024. Dkt. 5. The Amended Complaint brings a municipal liability claim under 42 U.S.C. § 1983 against Centurion in Count One for violating Plaintiffs' Eighth Amendment rights. Dkt. 5 at 30. Centurion now timely moves from summary judgment. Dkt. 109; S-Dkt. 115.

## LEGAL STANDARD

Summary judgment is only appropriate when there is "no genuine issue as to any material fact [such] that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001) (noting a court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party"). Once the moving party satisfies its initial burden, it shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e), (c). Speculation or conjecture cannot create a genuine issue of material fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). The court may not weigh the

evidence to resolve a factual dispute; if a genuine issue of material fact exists, the court must deny summary judgment. *Hutcherson v. Progressive Corp.,* 984 F.2d 1152, 1155 (11th Cir. 1993). Likewise, the court should deny summary judgment if reasonable minds could differ on the inferences arising from undisputed facts. *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992).

Additionally, a district court is only required to consider "the cited materials" when deciding a summary judgment motion, Fed. R. Civ. P. 56(c)(3), and "[m]aking district courts dig through volumes of documents and transcripts would shift the burden of sifting from petitioners to the courts. . . . [D]istrict court judges are not required to ferret out delectable facts buried in a massive record." *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011). "[T]here is no burden upon the district court to distill every potential argument that could be made based on the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1239 (11th Cir. 2012) (citing *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)).

## DISCUSSION

Centurion asks this Court to grant summary judgment on Plaintiff's municipal liability claim, arguing that Plaintiffs cannot show "inmates at Lowell CI were sexually assaulted by Dr. Benoit; (2) that Centurion knew about this sexual abuse by Dr. Benoit and failed to take reasonable measures to correct the alleged abuse[,] and (3) that such failure caused Plaintiffs' injuries." S-Dkt. 115 at 34–35. Defendant also asserts that Plaintiff Anderson's alleged sexual assaults by Dr. Benoit are outside the statute of limitations to bring a § 1983 claim against Centurion.  For the reasons discussed below, the Court rejects Centurion's arguments as there are several genuine disputes of material fact that only a jury can decide.

## I.    *Monell* Liability Claim

Plaintiffs bring one municipal liability claim under 42 U.S.C. § 1983 against Centurion. Like a municipality, private entities that provide state services are not vicariously liable for their employees' actions. *Harvey v. Harvey*, 949 F.2d 1127, 1129–30 (11th Cir. 1992) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)) (explaining that *Monell* applies to private corporations). Instead, "a municipality can be liable in only three situations: first and second, 'when execution of a government's (a) policy or (b) custom . . . inflicts the injury' the plaintiff suffered." *Smothers v. Childers*, 159 F.4th 922, 930 (11th Cir. 2025) (quoting *Monell*, 436 U.S. at 694) (alterations accepted). Third, "when a municipal official 'with final policy-

making authority in the area of the act or decision' makes the challenged act or decision." *Id.* at 930–31 (quoting *Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 968 (11th Cir. 2002)). These three situations are collectively referred to as the "policy or custom" requirement. *Id.* at 931.

Beyond the policy or custom requirement, a plaintiff must also "establish that the municipality undertook the challenged policy, custom, act, or decision 'with the requisite degree of culpability.'" *Id.* (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997)). In other words, the municipality must have acted "with deliberate indifference to its known or obvious consequences." *McDowell v. Brown*, 392 F.3d 1283, 1291 (11th Cir. 2004) (quoting *Davis ex rel. Doe v. DeKalb Cnty. Sch. Dist.*, 233 F.3d 1367, 1375–76 (11th Cir. 2000)). Finally, a plaintiff must show a "direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404. That is, a plaintiff must demonstrate that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Id.* (quoting *Monell*, 436 U.S. at 694).

When putting these elements together, to establish a *Monell* claim, "a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell*, 392 F.3d at 1289. Put differently, a private entity contracted to provide medical services to

inmates is only liable if it has a policy or custom of deliberate indifference to inmate
health and safety. *Craig v. Floyd Cnty.*, 643 F.3d 1306, 1310 (11th Cir. 2011).
Because Centurion contends that there is no genuine dispute regarding any of these
three elements, the Court will address each one in turn.

    *a.    Whether Plaintiffs' Eighth Amendment rights were violated*

    The Court need not spend much time on this element, as a reasonable trier of
fact could find that Dr. Benoit sexually assaulted Plaintiffs. The Eleventh Circuit has
already explicitly held that, "[i]n a case brought by a prisoner alleging sexual assault
by a prison official, that sexual assault necessarily violates the Eighth Amendment."
*DeJesus v. Lewis*, 14 F.4th 1182, 1196 (11th Cir. 2021).

    Centurion, however, argues that Plaintiffs' sworn statements and depositions
cannot show a constitutional violation because there is no corroboration of the sexual
assaults, and that their sworn testimony is not credible. S-Dkt. 115 at 35. But, as the
Court already articulated in its order denying Dr. Benoit's motion for summary
judgment,[7] there are several competing narratives of what happened during
Plaintiffs' gynecology appointments, and the Court is not at liberty to pick which
side it thinks is more credible. *See* Dkt. 166 at 7–8; *Feliciano v. City of Miami Beach*,
707 F.3d 1244, 1253 (11th Cir. 2013). Even if Plaintiffs' sworn testimonies are self-

---

[7] The Court incorporates by reference its prior order on Dr. Benoit's motion for summary judgment as it relates to this element. Dkt. 166 at 5–8.

serving and uncorroborated, "that alone does not permit [the Court] to disregard them at the summary judgment stage." *Feliciano*, 707 F.3d at 1253. Indeed, Plaintiffs' recollections of what happened during their gynecology appointments "are no more conclusory, self-serving, or unsubstantiated by objective evidence than" the sworn statements and depositions from Centurion's chaperones and Dr. Benoit. *Id.*; *compare* S-Dkt. 149 ¶¶ 29, 35, 40, 45, 51 (recounting the alleged sexual assaults by Dr. Benoit during Plaintiffs' appointments), *with* S-Dkt. 115 at 12–19 (discussing the sworn statements and testimonies from Centurion's chaperones who did not recall any inappropriate behavior by Dr. Benoit during appointments); S-Dkt. 106-8 at 206:16-207:20, 260:6-266:12 (showing deposition of Dr. Benoit denying all the allegations of sexual assault by Plaintiffs and other female inmates). Because the Court must credit the nonmoving party's version of the facts on summary judgment, *see Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc), the Court finds Plaintiffs have shown a genuine dispute that Dr. Benoit sexually assaulted them in violation of their Eighth Amendment rights.

> b. *Whether Centurion had a custom or policy that constituted deliberate indifference to Plaintiffs' constitutional rights*

Centurion spends most of its motion challenging the second element of a *Monell* claim, arguing that Plaintiffs have failed to set forth evidence showing it had a custom or policy that was deliberately indifferent to inmate safety. S-Dkt. 115 at 35–42. Specifically, Centurion asserts that none of the PREA reports it received

"involving Dr. Benoit were, after thorough investigation, sustained or founded." *Id.* at 37. As such, Centurion contends that it is not required to discipline or terminate Dr. Benoit based on "unsubstantiated allegations." *Id.* at 41. Additionally, Centurion cites its policy and practice of mandating annual PREA training for its providers and of requiring a female chaperone to be present during all gynecological examinations. *Id.*

Plaintiffs disagree, contending Centurion "had an unconstitutional custom and practice of deliberate indifference to the widespread and persistent risk of serious harm from sexual abuse by Dr. Benoit." S-Dkt. 149 at 14. Plaintiffs then point to several things in the record creating a genuine dispute, including the reports of incarcerated patients that reported sexual abuse by Dr. Benoit from 2018 to 2024, the OIG investigations about Dr. Benoit, Centurion policymakers being aware of alleged abuse by Dr. Benoit since it received copies of OIG's PREA reports, a 2020 DOJ report and investigation about widespread sexual abuse at Lowell CI, Centurion staff members being aware of numerous patient refusals to see Dr. Benoit for gynecology appointments, and the expert opinion of Dr. Noah Nattell. *Id.* Taken together, Plaintiffs argue these are enough that a reasonable jury could find that Centurion had a custom or policy that constituted deliberate indifference to Plaintiffs' constitutional rights. *Id.* at 14–15. The Court agrees with Plaintiffs, albeit barely.

"At *Monell*'s first step, [the Court] must identify an official policy that could plausibly have caused the constitutional violation at issue." *Smothers*, 159 F.4th at 932. "A custom is a practice that is so settled and permanent that it takes on the force of law," *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) (citation omitted), and it must be "persistent and widespread," so that Centurion had either actual or constructive knowledge of it. *Denno v. Sch. Bd. of Volusia Cnty.*, 218 F.3d 1267, 1277 (11th Cir. 2000) (citation modified). A policy can be proven "when a municipal official 'with final policy-making authority in the area of the act or decision' makes the challenged act or decision." *Smothers*, 159 F.4th at 930–31 (quoting *Cuesta*, 285 F.3d at 968). "[N]ormally, random acts or isolated incidents are insufficient to establish a custom or policy." *Id.* at 931 (citation modified).

Here, as Centurion correctly points out, "Plaintiffs cannot contend Centurion has an actual or official policy endorsing sexual assault of inmates at Lowell CI." S-Dkt. 115 at 34. Instead, the Court must determine whether there was an "unofficial" custom or policy within the company that ignored or tolerated Dr. Benoit's sexual assault of inmates. On this issue, there is a genuine dispute of material fact that final policymakers within Centurion not only knew about the alleged sexual assaults by Dr. Benoit but also failed to act upon such knowledge.

As an initial matter, the Court finds that the Centurion's Rule 30(b)(6) corporate representative, Vicki Love, was a final policymaker within Centurion from

at least 2018 to 2021. Ms. Love, who is currently the chief operating officer of

Centurion, served as vice president of operations from the inception of Centurion's

contract with FDC in 2016 and remained in that role until 2021. Dkt. 109-7 at 22:6-

21. Ms. Love made it clear that any adverse employment decision following an OIG

investigation of a Centurion employee would be the sole decision of the vice

president of operations. *Id.* at 97:8-18 ("Q. And other than the HR team, [is] there

anyone else in Centurion by title that is responsible for deciding any employment

action that should be taken at the conclusion of an Office of the Inspector General

PREA investigation? A. No. . . . Q. And the vice president of operations in that

instance, would they have the final say so? A. Based on input from the HR team.").

Notably, any such employment decision by the vice president of operations

would be unreviewable by any other person in Centurion. *Id.* at 97:19-22 ("Q. Would

the vice president of operations' decision in that instance be reviewed by anyone

else who works for Centurion? A. No."). Nor has Centurion disputed that the vice

president of operations is a final policymaker with respect to employment decisions

for personnel under investigation for misconduct.

Because the vice president of operations is an official "with final policy-

making authority in the area of the act or decision," *Smothers*, 159 F.4th at 930, the

Court must determine whether there is a material dispute that Centurion's vice

president of operations tolerated or ratified an unofficial policy "of deliberate

14

indifference to the widespread and persistent risk of serious harm from sexual abuse by Dr. Benoit." S-Dkt. 149 at 14. When construing all the evidence and inferences in the light most favorable to Plaintiffs, there are genuine disputes as to whether Centurion (through its vice president of operations) properly permitted Dr. Benoit to continue seeing patients at Lowell CI, given numerous complaints and PREA reports. Importantly, the record shows that the vice president of operations receives every PREA report from OIG following an investigation of a Centurion employee:

> Q. Who from Centurion reviews those OIG reports about PREA?
> A. They -- they -- I think they come to the vice president of operations, who shares it with the HR team.
>
> Q. Anyone else?
> A. No.
>
> Q. Would it come to the desk of the chief operations officer?
> A. No.
>
> Q. Why is that?
>  A. They come to the vice president of operations, who is the -- the lead person on the contract.
>
> Q. Is that process explained in writing anywhere?
> A. No.
>
> Q. Folks who work for Centurion just know that that's the process to follow?
> A. I know because when I was vice president of operations, the OIG reports came to me.

Dkt. 109-7 at 103:7-24; *see also id.* at 117:25-108:8 ("Q. How would Centurion normally get notified by the [OIG] that a PREA report involving one of its

employees had been closed? A. We'd receive the -- the written report. Q. Who in

Centurion would get that written report? A. The vice president of operations. Q. And

in 2018, was that you? A. Yes."); *id.* at 157:12-19 ("Q. Okay. And so when in -- an

-- a PREA investigation like this was suspended involving Dr. Benoit, the [OIG]

would send Centurion a copy of the investigation findings; is that right? A. I don't

know if they sent us this one, but it was -- it is the – [OIG's] policy to send us a

redacted final investigative report.").

When explicitly asked if Centurion had an unofficial policy about how it deals

with employees once it receives OIG's final PREA report, Centurion explained:

> Q. And so if I understand the testimony, after Centurion received the
> first report of sexual abuse by Dr. Benoit, it did not do anything
> independent of the Office of Inspector General investigation; is that
> right?
> A. That's correct.
>
> Q. What about after the third report?
> A. We did not do anything independent of the Office of Inspector
> General.
>
> Q. What about after the fifth report?
> A. The same, we did not do anything.
>
> Q. Is Centurion's view that at some point, something should have been
> done about Dr. Benoit related to all of these PREA reports? . . .
> A. If any of them had been substantiated, we certainly would have.
>
> Q. And only if they were substantiated, so [Centurion] would've done
> something; is that correct?
> A. Correct.

*Id.* at 181:7-182:3; *see also id.* at 135:8-140:10 (discussing Lorely Lafont's 2020

PREA report about Dr. Benoit and noting if the allegations in the PREA report were
"founded" or "true," then Centurion would have taken "corrective action" by
terminating Dr. Benoit). The explicit acknowledgment that Centurion had known
about the sexual assault allegations being made against Dr. Benoit but a final
policymaker (i.e., the vice president of operations) chose to do nothing since none
of the PREA reports were "substantiated" or "sustained" is sufficient to show (in a
light favorable to non-movants) that Centurion had an unofficial policy that "could
plausibly have caused the constitutional violation at issue." *Smothers*, 159 F.4th at
932.

Next, the Court must consider Centurion's culpability. That is, whether a
reasonable jury could conclude Centurion acted with deliberate indifference to the
"known or obvious consequences" of its unofficial policy of continuing to allow Dr.
Benoit to see patients at Lowell CI. *McDowell*, 392 F.3d at 1291; *see also Brown*,
520 U.S. at 410 ("'[D]eliberate indifference' is a stringent standard of fault,
requiring proof that a municipal actor disregarded a known or obvious consequence
of his action.").

At this stage, Plaintiffs have provided sufficient evidence for a reasonable jury
to find that Centurion knew or ignored the consequences of allowing Dr. Benoit to
continue seeing patients at Lowell CI. The record shows there were numerous
grievances and complaints made by various inmates concerning Dr. Benoit's alleged

sexual assaults. While not all of these complaints made it to the vice president of operations, many were communicated to other Centurion staff members at Lowell CI.

For example, Plaintiff Anderson told Centurion medical staff at Lowell CI that Dr. Benoit had sexually abused her, including Dr. Jose Rodriguez, Centurion's former Medical Director at Lowell CI; Ms. Hamilton, a nurse practitioner; Ms. Sabrina Midea,[8] a group meeting counselor; Ms. Carlyle, another nurse; and Ms. Sarduy, a nurse practitioner. S-Dkt. 149-1 ¶¶ 34, 100; *see also* S-Dkt. 134-4 at 7, 12–13, 22, 27 (showing Plaintiff Anderson's responses to Dr. Benoit and Centurion's interrogatories). Plaintiff Crowley allegedly informed medical staff that Dr. Benoit had sexually abused her, including Centurion nurses and one of the chaperones in the room with her during an appointment with Dr. Benoit. S-Dkt. 149-1 ¶¶ 60, 64; *see also* S-Dkt. 115-8 at 30:7-32:4, 102:18-104:12 (showing Plaintiff Crowley's deposition and recounting who she informed about her abuse). Plaintiff Meadows testified that she informed her Centurion mental health counselor, Ms. King, about the sexual abuse and the physical injury that she suffered as a result of Dr. Benoit's actions. S-Dkt. 149-1 ¶ 53; *see also* S-Dkt. 154-8 at 22, 26 (showing Plaintiff Meadow's response to Centurion's interrogatories); S-Dkt. 102-4 at

---

[8] Ms. Midea later remarried and changed her last name, so parts of the record refer to her as Ms. Lambert. *See* Dkt. 109-5 at 16:12-13.

103:17-104:10, 113:8-24, 126:13-127:5 (showing Plaintiff Meadow deposition about reporting Dr. Benoit's abuse to Ms. King). Plaintiff Luongo asserted she told the Centurion medical staff that Dr. Benoit's behavior was inappropriate during a pap smear, but none of them made a PREA report. S-Dkt. 149-1 ¶¶ 35, 38; S-Dkt. 134-5 at 21, 25 (showing Plaintiff Luongo's response to Centurion's interrogatories).

Along the same vein, the record contains evidence that some female inmates refused to attend gynecological appointments with Dr. Benoit, as Centurion made these inmates attend group refusal meetings to educate them on the necessity of routine medical screenings. While it is not entirely clear if these refusals were communicated to any final policymaker within Centurion, *see* Dkt. 109-7 at 184:1-5, there is evidence that these refusals were well known to Centurion medical staff at Lowell CI. Centurion's Statewide Medical Director, Dr. John Lay, created a script for medical staff to follow when conducting group meetings with inmates who refused pap screenings and breast examinations from Dr. Benoit. S-Dkt. 149-1 ¶¶ 171, 172; S-Dkt. 134-18 (showing email communications between Dr. Lay and Centurion medical staff at Lowell CI about the group refusal meetings); Dkt. 109-5 at 110:17-23 (showing Ms. Midea/Lambert's deposition explaining that Dr. Lay provided a script for group counselors to read during the refusal meetings).

During some of these group refusal meetings, Plaintiffs allegedly told Centurion medical staff about Dr. Benoit's sexual abuse. *See e.g.*, S-Dkt. 154-3 at

19

13 ("Plaintiff [Anderson] was required to attend a meeting in or around March 2024 with Ms. Midea, who may be a nurse, and spoke with Plaintiff and other incarcerated women about refusals to see Defendant Benoit."); S-Dkt. 154-6 at 5–6 ("When Plaintiff [Crowley] recently refused a gynecological examination with Defendant Benoit, she was required to go to a meeting about her refusal. The meeting was run by a woman who identified herself as a medical employee at Lowell CI. Crowley, and others present who were refusing medical care, told the person leading the meeting why they were refusing their visits with Defendant Benoit and that he had abused them."). Further, despite Plaintiffs Anderson, Crowley, and Luongo filing third-party grievances in December 2023 about Dr. Benoit's sexual abuse, Centurion medical staff required them to see Dr. Benoit or refuse care. S-Dkt. 149-1 ¶¶ 29, 35, 39, 40; S-Dkt. 134-6 at 39 (showing Crowley seeking another provider); S-Dkt. 134-14 at 88 (showing Anderson seeking another provider); S-Dkt. 134-15 at 14 (showing Luongo seeking another provider); Dkt. 109-5 at 111:3-112:21 (showing Ms. Midea/Lambert's deposition explaining that during the group refusal meetings, even if an inmate refused to see a provider due to a past history of sexual trauma or due to an open PREA complaint against a provider, Centurion's statement to the inmate "would be the same: You do not get to pick your provider").

Centurion's reply, however, argues that "[t]here has never been a counseling session about refusals to see Dr. Benoit." Dkt. 150 at 8. To support this argument,

20

Centurion cites Ms. Midea/Lambert's deposition, where she denied hearing any inmate say they refused to see Dr. Benoit due to an open PREA complaint. *Id.* (citing Dkt. 109-5 at 122:13-123:3, 123:17-22, 124:24-125:8, 126:16-127:2). But as discussed above, Ms. Midea/Lambert's deposition is contradicted by the sworn statements of Plaintiffs and documentation showing that some inmates sought another provider due to open PREA complaints against Dr. Benoit. Again, when there is a factual conflict, the Court must credit Plaintiffs' version on summary judgment. *See Evans*, 407 F.3d at 1278.

Beyond these complaints and refusals to medical staff within Lowell CI, final policymakers within Centurion had actual knowledge of at least five alleged sexual assault complaints against Dr. Benoit when it received OIG's PREA reports. As discussed above, Centurion's corporate representative repeatedly confirmed that the vice president of operations would receive copies of the PREA reports concerning Dr. Benoit and that it was OIG's "normal course of business" to send such reports to Centurion. Dkt. 109-7 at 147:14-148:3; *see also id.* at 103:7-24, 117:25-108:8, 139:4-7, 157:12-19, 158:20-24, 181:7-182:3.[9]

Centurion, however, argues that its vice president of operations being aware

---

[9] In its reply, Centurion claims "the evidence shows the OIG failed to provide its closed reports in most if not all of the cited cases." Dkt. 150 at 4 (citing Dkt. 109-7). But this claim is directly contradicted by other statements from Centurion's corporate representative, who states that while she may not specially recall whether Plaintiffs' PREA reports were sent to Centurion, it is OIG's "policy to send us a redacted final investigative report." Dkt. 109-7 at 157:12-19; *see also id.* at 103:7-24, 117:25-108:8, 139:4-7, 147:14-148:3, 158:20-24, 181:7-182:3. The conflicting testimony is viewed in the light most favorable to Plaintiffs. *See Allen*, 121 F.3d at 646.

of the PREA reports does not matter, as the Eleventh Circuit "has made clear that to prove a widespread pattern of constitutional violations, the Court requires more than evidence of unsubstantiated allegations." S-Dkt. 115 at 37. Therefore, because "there were no substantiated findings [in the PREA reports] made against Dr. Benoit, pursuant to the binding case law, there cannot be an established and widespread practice of indifference." *Id.* at 38; *see* Dkt. 150 at 4. The Court believes this is in material dispute.

While Centurion is correct that the Eleventh Circuit seemingly requires complaints about an employee to have merit, *see Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987) ("[The plaintiff] never demonstrated that past complaints of police misconduct had any merit. Indeed, the number of complaints bears no relation to their validity."), nothing in the record suggests that all the PREA reports were without merit—several of the PREA reports were incomplete and never absolved or exonerated Dr. Benoit of any wrongdoing. There is also evidence that OIG's investigations were not reliable, and it is a disputed issue whether Centurion knew there may be flaws in OIG's investigations into PREA complaints.

First, Centurion's argument that all the PREA reports cleared Dr. Benoit of wrongdoing is incorrect. Plaintiffs' PREA reports were "unsubstantiated," with the investigation being "suspended." S-Dkt. 115-5 at 51, 183, 356. A PREA finding of "unsubstantiated" does not mean Dr. Benoit was exonerated; instead, it only means

22

that the complaint was "investigated and the investigation produced *insufficient evidence* to make a *final determination* as to *whether or not the event occurred*." 28 C.F.R. § 115.5 (emphasis added). Similarly, an investigative conclusion of "suspended" under FDC Procedure 108.015 only means OIG's investigation showed that the "evidence is insufficient to close as unfounded, closed by arrest, or exceptionally cleared." Dkt. 109-1 at 24. Prior to Plaintiffs' PREA reports, there were two other PREA reports from Frances Gibson and Lorely Lafont. *See* Dkt. 115-5 at 229 (showing Gibson's PREA report concerning a 2018 gynecological exam by Dr. Benoit); *id.* at 269 (showing Lafont's PREA report over a July 2020 pap smear exam by Dr. Benoit). Both PREA reports also ended with an investigative conclusion of "suspended." *Id.* at 229, 269. Thus, viewed in the present posture, Centurion had at least five PREA reports that arguably made them aware of possible, asserted sexual abuse by Dr. Benoit, none of which had a finding of "exonerated" or "unfounded."

Second, concerning the adequacy of OIG's investigation into all ten PREA reports, the record contains a Department of Justice ("DOJ") report into Lowell CI, dated December 22, 2020. *See* Dkt. 133-17 at 25–28.[10] In the document, the DOJ makes several findings on the adequacy of OIG's investigations into sexual abuse

---

[10] The Court notes that the DOJ report states, "this Notice is not intended to be admissible evidence and does not create any legal rights or obligations." Dkt. 133-17 at 4. However, Centurion never addressed the report's admissibility on summary judgment in any of its extensive briefings before the Court.

23

complaints at Lowell CI. Notably, the DOJ report states that OIG "fails to meaningfully investigate allegations of sexual abuse" at Lowell CI. *Id.* at 25. These failures include: "closing cases without conducting appropriate investigation of available evidence, closing cases upon the accused staff's termination or resignation, delays in reviewing and investigating allegations, and inaccuracies in documenting and tracking employee terminations and dismissals." *Id.* Centurion does not challenge the findings in the DOJ report; instead, it simply notes that the DOJ report does not mention Dr. Benoit or any instance of sexual abuse within the gynecological care rendered by Centurion. Dkt. 150 at 7.[11]

Third, when construing the evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude that Centurion had notice of a need to act, given its knowledge about OIG's possibly inadequate investigations into PREA complaints. *See Love v. Lee Mem'l Health Sys.*, No. 2:20-CV-379-JES-MRM, 2022 WL 19653, at *5 (M.D. Fla. Jan. 3, 2022) (finding that while the defendant's risk manager concluded that a sexual assault allegation was not credible, evidence in the record showed the risk manager conducted an inadequate investigation). Centurion admits a final policymaker was aware of the DOJ report's findings and that the DOJ had subpoenaed Centurion to produce documents regarding Dr. Benoit in 2023.

---

[11] However, the DOJ report does mention unrelated instances of sexual abuse by one of Centurion's psychiatrists. Dkt. 133-17 at 24; Dkt. 109-7 at 212:10-25. In discussing this case, the DOJ report identified several major errors and omissions in OIG's investigation. Dkt. 133-17 at 24–25.

Centurion testified that the company was "familiar" with the 2020 DOJ report, as its

corporate representative "remember[s] it occurring when [she] was vice president of

operations." Dkt. 109-7 at 202:15-203:6. When specifically questioned about the

DOJ's findings on the inadequacy of OIG's investigation into PREA complaints,

Centurion admitted:

> Q. [The DOJ Report] says, "Lowell's inadequate system for investigating reports of sexual abuse subjects prisoners to a substantial risk of harm"; do you see that?
> A. Yes.
>
> Q. Okay. And then there's a small letter "A" underneath this that says, "Investigations are closed, suspended, or disposed of with minimal disciplinary action after inadequate investigation of available evidence"; do you see that?
> A. Yep.
>
> Q. Okay. Did Centurion have any internal discussions related to this finding by the Department of Justice?
> A. No.
>
> Q. And after this finding by the Department of Justice, did Centurion continue to rely on [the] Office of Inspector General Investigations about PREA?
> A. Yes.
>
> Q. And after this Department of Justice report, did Centurion discuss taking any other action related to its own investigations of allegations of sexual abuse at Lowell Correctional Institution? . . .
> A. No.

*Id.* at 208:5-209:11.

The record also shows Centurion was aware that the DOJ was looking into the

sexual abuse allegations made by incarcerated patients. *Id.* at 213:19-24; S-Dkt. 149-

1 ¶ 170. The DOJ issued several subpoenas to Centurion in April 2023, seeking any documentation the company had regarding Dr. Benoit and his patients. *See* S-Dkt. 134-19 (showing subpoenas and email communications between Centurion's general counsel and the DOJ); Dkt. 109-7 at 213:25-214:13. Centurion general counsel and operations leadership communicated with DOJ officials about the allegations against Dr. Benoit and the related subpoenas. S-Dkt. 134-19 at 8–13, 20. While the DOJ never sued Lowell CI or prosecuted Dr. Benoit, the absence of prior lawsuits is not determinative of whether Centurion was on notice of unconstitutional conduct by one of its medical providers. *See Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1311 (11th Cir. 2001) ("[W]e do not believe that the absence of prior lawsuits or EEOC complaints is determinative on the issue whether the City is on notice of blatantly unconstitutional conduct by its high-ranking officials. Nor are we overly concerned with the lack of formal complaints within the City government either.").

Viewing the evidence and inferences in a light most favorable to Plaintiff, the Court finds there exists genuine issues of material fact as to whether Centurion was on notice of the risk posed by Dr. Benoit once it received several PREA reports, and whether Centurion acted with deliberate indifference to the "known or obvious consequences" of its unofficial policy to never act unless it received a substantiated or sustained PREA report. *McDowell*, 392 F.3d at 1291; *see, e.g.*, *Depew v. City of St. Marys, Georgia,* 787 F.2d 1496 (11th Cir. 1986) (finding the city's knowledge

of prior complaints, its failure to take remedial action, and lack of inclination to remedy pattern of known constitutional violations is precisely the type of informal policy or custom that is actionable under § 1983).

> c. *Whether Centurion had a custom or policy is the moving force behind the constitutional violation*

Finally, as to the causation requirement, Plaintiffs must show that policy or custom caused their sexual assaults. *McDowell*, 392 F.3d at 1289; *see Smothers*, 159 F.4th at 931 (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)) ("[W]e consider 'whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'"). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. In other words, Centurion's policy or custom must be the "moving force" behind the constitutional violation. *Id.*

Here, a reasonable jury could infer that, but for Centurion's unofficial policy to only act on substantiated or sustained PREA reports, Dr. Benoit would not have sexually assaulted Plaintiffs. Indeed, as Centurion repeatedly admits, if the company had considered any of the allegations in the PREA reports—dating as far back as Nilufer McCoy's PREA report in 2019—to be "true," it would have taken "corrective action" against Dr. Benoit and terminated his employment. *See* Dkt. 109-

27

7 at 119:18-120:12 (discussing McCoy's PREA report); *id.* at 139:4-140:10
(discussing Lafont's PREA report); *id.* at 162:2-163:23 (discussing Plaintiff
Luongo's PREA report).

Moreover, the record contains evidence that, as early as 2018, Centurion had
the capacity to conduct its own investigation, independent of the OIG, into its
employees' actions. *See* S-Dkt. 144-4 (showing emails between Ms. Love and
Centurion's risk manager discussing HR's investigation into McCoy's complaint
about Dr. Benoit). These email communications also indicate that both Centurion's
HR department and Ms. Love suggested that Dr. Benoit be placed on paid leave or
"transition[ed]" to another facility, given the severity of Ms. McCoy's allegations.
*Id.* at 3–4. Similarly, Centurion admits that even after an OIG investigation is closed,
it can still take adverse action against an employee following an investigation by its
own "HR business partner." Dkt. 109-7 at 95:2-97:22. Thus, there is a disputed issue
of fact about whether Centurion's unofficial policy of total reliance on OIG's
investigations and allowing Dr. Benoit to continue working at Lowell CI was the
moving force behind Plaintiffs' constitutional injuries.

At bottom, although the Court might be doubtful of the merits of Plaintiffs'
municipal liability claim at trial, Plaintiffs have presented enough evidence to
survive summary judgment. To be clear, the Court is not saying that sexual abuse
occurred by Dr. Benoit, or that Centurion or its officers did anything wrong. The

Court is only noting that the facts (viewed in the light most favorable to the non-movants) are sufficiently contested that Plaintiffs should not be "thrown out of court," and instead should have a jury decide these factual issues. And the Court is well aware of the prison environment, where gossip, rumor, fable, and groupthink may predominate. Indeed, almost every claim arising during a gynecological examination was conducted with a female chaperone present. Certainly, Plaintiffs did not reside at Lowell CI because they were solid, reliable citizens. They are entitled, though, to their day in court. Accordingly, the Court denies summary judgment on the municipal liability claim in Count One.

## II.    Statute of Limitations

The Court now turns to Centurion's argument that one of Plaintiff Anderson's sexual assault allegations is untimely. *See* S-Dkt. 115 at 30. Section 1983 claims are subject to state statutes of limitations governing personal injury actions. *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008). The statute of limitations for claims brought pursuant to 42 U.S.C. § 1983 in Florida is four years. *Van Poyck v. McCollum*, 646 F.3d 865, 867 (11th Cir. 2011).

"The continuing violation doctrine is premised on the equitable notion that the statute of limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1222 (11th Cir. 2001) (citation

modified). "If an event or series of events should have alerted a reasonable person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine." *Ctr. for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1335 (11th Cir. 2006) (citation modified). A continuing violation is also "a single violation of an ongoing nature," not a "a series of repeated violations that result in related harms." *Doe ex rel. Doe #6 v. Swearingen*, 51 F.4th 1295, 1306 (11th Cir. 2022) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). When "a defendant takes separate and discrete acts that repeatedly violate the law, the continuing violation doctrine does not apply." *Id.* (citing *Knight v. Columbus*, 19 F.3d 579, 580–82 (11th Cir. 1994)).

Here, Ms. Anderson alleges that Dr. Benoit sexually assaulted her at two appointments: February 1, 2019, and March 13, 2020. *See* Dkt. 5 ¶ 37; Dkt. 149-1 ¶ 29. As the Court discussed in its prior order on Dr. Benoit's motion for summary judgment, Plaintiff Anderson's alleged assaults were "separate and discrete acts," so the continuing violation doctrine does not apply. Dkt. 166 at 8–9. The record is clear that Dr. Benoit's two sexual assaults of Plaintiff Anderson were not a single ongoing violation; rather, it was two repeated violations that resulted in similar harms. *See Swearingen*, 51 F.4th at 1306. Therefore, the February 1, 2019, appointment falls outside of the statute of limitations and is time-barred.

### III.    Plaintiffs' Prayer for Punitive Damages

One final note, Centurion argues that Plaintiffs have "failed to proffer evidence to sustain a claim for punitive damages against Centurion." S-Dkt. 115 at 43. Punitive damages are available in a § 1983 case "when the defendant's conduct is shown to be motivated by evil motive or intent or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 55 (1983). The Court grants this part of Centurion's motion and removes the punitive damages claim for two reasons. First, Plaintiffs do not establish, as a contested fact, the required evil intent by Centurion. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1265 (11th Cir. 2020) (noting the subjective intent component of an Eighth Amendment sexual assault claim required the plaintiff to show the "force" used was "sadistically and maliciously applied for the very purpose of causing harm"). There is no proof of the outrageous, wantonly reckless conduct required to support punitive damages, as Centurion and its final policymakers were not the ones personally using "force" against Plaintiffs during gynecological appointments.

Second, the Eleventh Circuit has been clear that "[i]n a § 1983 action, punitive damages are only available from government officials when they are sued in their individual capacities." *Young Apartments, Inc. v. Town of Jupiter, Fla.*, 529 F.3d 1027, 1047 (11th Cir. 2008) (citing *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 267 (1981)); *see also Colvin v. McDougall*, 62 F.3d 1316, 1319 (11th Cir. 1995)

31

(holding that "punitive damages are generally not allowed against a municipality" and that "a punitive damage award against [the sheriff] in his official capacity" is likewise barred); *Kentucky v. Graham*, 473 U.S. 159, 167 n.13 (1985) ("In addition, punitive damages are not available under § 1983 from a municipality."). Because Centurion is being sued in its official capacity under *Monell*, the Court grants Centurion's request to strike Plaintiffs' prayer for punitive damages on the municipal liability claim in Count One.

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that:

1.  Defendant Centurion's Amended Motion for Summary Judgment, Dkt. 109; S-Dkt. 115, is **GRANTED in part and DENIED in part:**

    a.  Plaintiff Anderson's February 1, 2019, allegation, *see* Dkt. 5 ¶ 37, is **DISMISSED as time-barred**;

    b.  Plaintiffs' prayer for punitive damages against Centurion in Count One, Dkt. 5 at 44, is **STRICKEN**; and

    c.  Defendant Centurion's motion is **DENIED** in all other respects.

**DONE** and **ORDERED** at Tampa, Florida, on January 15, 2026.

WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE

**<u>Copies furnished to</u>**:

Counsel of Record